Our last case for oral argument this morning is 23-3368 U.S. v. Curtin. Welcome back, Mr. Roy. Thank you, Judge. May it please the Court, Attorney Michael Roy on behalf of Appellant Dana Curtin. This Court should vacate Mr. Curtin's conviction and remand for a new trial with Dr. Sala's testimony. I want to briefly talk about a harmless error, since that is often an issue in these sort of like to catch a predator style sting operations. And the main point I want to make is that when compared to, I know this Court sees a lot of these sting operations, this is kind of the borderline of what is the bare minimum necessary to convict someone, I would argue. Judge Lee, I know myself and Mr. Simpson recently argued Austin McLean's case in front of you. I think that was actually the same undercover agent as this case. That's a good example of what the text messages normally look like, giving nude photos to the minor, describing very graphically what sexual activities they want to perform. I know everyone on this panel has probably worked on a ton of these cases, seen a bunch of these. Judge Maldonado, I'll confess I'm not sure how many of these cases you've personally worked on, but we have on pages 36 and 38 of our brief what I think are some good representative examples. And that's only scratching the surface. That's only from this circuit as well. A brief overview of the law will show lots of cases where usually the text messages at issue are much more graphic than what was here. And I think that's why Dr. Saylor's opinion was so important, because that was rebutting the one big piece of evidence the government had apart from the text conversation, which was their argument that Dana Curtin's habits with obsessive adult pornography consumption, obsessive solicitation of adult prostitutes, the government used that to argue that his sexual appetites with adults was evidence of an intent to also have sex with the minor. And that's what Dr. Saylor could have rebutted, both of his opinions that we're arguing about. Can I clarify exactly what opinions you wanted to elicit from Dr. Salah? I think one was clearly that wanting to have sex with an adult is different from wanting to have sex with a minor. But what other opinion did you seek to elicit from him? Sure. And I think maybe this is going towards the waiver. It is. Between the parties. It is. Yes. So I want to clarify and make sure I'm not missing something, because there were some arguments made about opinions on intent that I just don't see in his report as disclosed. But other than, could you explain to me, please, what it is that you sought to elicit? And I will concede some of the arguments come off as a bit muddled from the trial record. Yes, that's why I'm seeking clarification. I think that the two easiest points I'd point out is, first, the Britain pretrial filings. He filed a report and he said his main opinion was, I evaluated Mr. Curtin in person, plus reviewed a whole bunch of other documents. And my opinion is he does not meet the criteria for pedophilic disorder or any other paraphilic disorder. And specifically, he doesn't meet it because he lacks the sexual urges, sexual interests in children that is a DSM-5 criteria. And is that the opinion that you wanted to elicit? That he does not have the criteria for the pedophilia disorder? Exactly. That is one of the opinions. Okay. Then why didn't you waive that? I would point again towards the pretrial motions in that Curtin very clearly waived any argument that a lack of pedophilic disorder is an affirmative defense. And we aren't arguing that on appeal, either, because that would— Before the court, though, this representation was made that counsel agreed with the judge that you were not, I'm quoting, not trying to call the expert to talk about pedophilia. I believe you're pointing to page 7 of the transcript. I don't have the precise page before me, but that is a quote. So I am trying to understand how with that and then various other representations, how you have preserved that issue. I think it's looking at the context. In the written filings, I'm not sure what else it would have been they would be calling Dr. Solita to say if not he lacks these sexual urges. That's why I'm asking these questions, because although, as you said, the record is a bit muddled because there were arguments about intent and potentially trying to use this for intent, which I did not understand what those were and where those had been disclosed. Because that looked like something different than what we're talking about now. Sure. And I understand that. Although, I will point in page 11 in the response to Motion to Eliminate, they do say he's going to give his opinions about his diagnostic testing. It's at the very top of page 11. And the government's quotes for waiver, I think the written ones are easy to address since those are all very clearly about the sort of—maybe what's an NGI-type defense that they're disclaiming, right? Now the oral statements, the one you were just pointing to, Judge, about won't talk about pedophilia, I think in context that's also saying he's not going to opine on the ultimate issue or say that a disorder is required to have intent. Right after the defense counsel says that, she goes on to say, but he will testify about the diagnostic criteria. I don't know what else I could be referring to. The response from defense counsel, the district court specifically said, expert testimony on a diagnosis or lack thereof of pedophilia disorder is not admissible. And defense counsel agreed with the judge. So how was the court supposed to know that this issue that you were still trying to admit? I think it's in the same paragraph that—but we do want him to talk about the DSM-5. We do want him to talk about the criterion of the DSM-5. And then going on, the government understands the defense's argument to be eliciting opinion about whether or not he has a sexual interest in children. Page 8 of the transcript, the government's saying—the defense is still saying they're going to present the same thing. It's at the top of page 8. Expert's opinion is to talk about the different factors that go to intent as they relate to DSM-5. All that gets back to some diagnosis, which is irrelevant. That was the government's response to the defense's position. Same thing with the middle of trial, on page 321 of the transcript, where there is—they say we're not going to solicit an opinion that he has pedophilic disorder. Government says that it was supposed to say that he does not. I think in context, they're again saying we're not going to solicit an opinion that pedophilic disorder is a defense. And then going on, they say we'll testify about the diagnostic criteria. And once again, on page 326, the government is still arguing that the defense's argument is that they're going to elicit some sort of opinion about a diagnosis that they say is irrelevant. So the government thought at the time that the defense was still going to push this. I'll also say, even if this can be construed as defense waiving or disclaiming any opinion that he lacks a formal diagnosis, they were still repeatedly clear that they wanted to solicit the opinion about the criteria and whether he met the criteria. So even if Dr. Tilley did not say the final thing, I opine he does not have pedophilic disorder, I think the defense was pretty clear that they wanted him to say he does not have sexual urges towards children, he does not have sexual fantasies about children. And really, that's more the pertinent trait than what the diagnosis is anyway. So then, why does it matter, right? Why is that relevant? I can see how the presence of a disorder might make it more likely than not when a person is compared to general population, but the absence of a disorder, why is that relevant to intent when the expert, I think it's himself, the expert himself said that, you know what, whether or not you have pedophilic disorder does not really mean anything about whether or not you're going to commit the crime. Sure. And I think that's the only way that any opinion like this could ever come in. There's no expert would be allowed to say he has no pedophilic disorder, so he could not have had the intent. That would have been an opinion on the ultimate issue intent, which is not allowed. So he was just fitting within the guardrails. This court has been very clear, Rule 702 does not require them to give opinions on an ultimate element. It doesn't matter if the opinion would negate an element directly or not. So when he said it's not relevant, you're saying that it doesn't mean relevant in the legal, in the 401 sense, he means relevant directly with regard to the question of intent? Yes, my understanding of Dr. Soto's testimony is that he would not have opined on the ultimate issue, but it still would have, he would have given the opinion in terms of, I mean he's not a lawyer, he's a doctor, right? So then it comes to my question is why is the lack of a disorder relevant at all with regard to the charge in this case? I mean for the same reason that any pertinent trait is relevant in a criminal case. But it's not, it's a lack of a trait, right? It's not that you have a trait, it's the lack of a trait. So no, but I think because if you think about the lack of a trait, that's the general population, right? And so its probative value would certainly be much less compared to the presence of a trait, whereas the lack of a trait does not. So I'm curious as to why the lack of the pedophilic disorder would be relevant to this case. I think maybe there's a metaphysical question there too, whether a lack of a trait is a trait or not. I would say it still is a trait, and I'd point to the D.C. Circuit's case in Hite where they reversed for a court that left out very similar testimony. I'd also point out that the government was trying to make the argument about his sexual interests. The government had put it into issue, and there was a lot of evidence about him going to an escort website, essentially. So this would have been directly relevant to pointing out what his interests were. And I see I'm out of time. I'll give you an extra minute. Okay. All right. Thank you, Judge. Thank you. Mr. Simpson. Hello, Your Honors. May it please the Court, I'm Scott Simpson on behalf of the United States. First of all, in relation to waiver, I think what we are seeing here, and I think this comes out in the district court record and the transcripts, I think we're seeing that the defense was shifting its arguments in response to the government's motion, in response to the district court's reaction. They were shifting their arguments in an attempt to find a formulation for Mr. Saleh's expert testimony that the district judge would accept. In their expert disclosure, they said that Dr. Saleh would testify that Curtin did not, quote, meet the diagnostic and statistical manual's diagnostic criteria for pedophilic disorder, close quote, didn't say, I have to differ with defense counsel, it didn't say that was going to be the main focus of Dr. Saleh's testimony. It's a very short report. It said that's what it was going to be. But that wouldn't be waiver. I mean, it's disclosed, even if it's not the main focus. Just the mere disclosure of the pedophiliac tendency's opinion would be sufficient. But Your Honor, that was waived not because of what the report said, the disclosure said, but because of what defense counsel said. I thought you were arguing that wasn't sufficient. No, no, no. That would have been sufficient if they had kept, if they had not withdrawn. Basically they withdrew that argument, they withdrew that offer to have the expert testify on that. That's what they were saying initially. That's all they were saying initially. And that was partially in response to the fact that the government had disclosed a witness. Partially, yes, Your Honor. And that you, the government ultimately elected not to put that expert on the stand. Correct, exactly. Which probably took away some of these arguments from them and it seemed like that's when the shifting started. Possibly, possibly. But as you look at the transcripts, it seems like mainly what took it away, what caused them to change their approach here, change their tactic, change their argument, was basically the district court expressing doubts about accepting expert testimony on that issue. That is, the lack of a diagnosis. And so, as the court has already referred to, once the district court expressed doubts about accepting expert testimony on that diagnosis, defense counsel said, okay, quote, we're not trying to call him to talk about pedophilia, close quote. Rather, at that point, they said they just wanted Dr. Saleh to quote, opine about the factors that a jury would consider in determining whether or not someone had the intent, close quote. That's not the same. That's not the same as the diagnosis. It's not the same as talking about whether Mr. Curtin had pedophilic tendencies. That's just general factors that the jury could consider. And was that disclosed? I didn't see that disclosed in either the initial letter or the subsequent report. It was not, Your Honor. It actually was not. And then the defense, after that point, the defense never again said that they wanted Dr. Saleh to testify that Curtin did not have pedophilic disorder or pedophilic tendencies. As the discussion continued, and as you see in the transcript, this was quite some long discussions with the court, they reiterated the argument about having Dr. Saleh talk about what factors the jury should consider in determining intent. They brought up that Dr. Saleh could testify that a sexual interest in adults doesn't necessarily support a sexual interest in children. So crucially, another fact here in the record that supports the fact that they waived the argument is the district court did not rule on whether the defense could present expert testimony that Curtin did not have pedophilic disorder or pedophilic tendencies, since that was no longer what the defense was arguing. And when the court gave its ruling, when the court gave its ruling saying, no, I'm not going to let Dr. Saleh testify, the court referred to this concept about a sexual interest in adults is not a sexual interest in children, and at that point, the defense counsel could have, but did not say, I'm sorry, Your Honor, hold on a moment. How about testimony that Mr. Curtin does not have pedophilic disorder or pedophilic tendencies? They didn't do that. So unfortunately, the defense here on appeal has to live with what defense counsel said and did below. So on the merits, along the whole continuum of district court decisions about evidentiary rulings, this decision here about admitting an expert under Rule 702A, that's pretty close to where this court, I think, gives the district courts the greatest deference. Would the proffered expert testimony help the jury understand the evidence or determine a fact and issue? That's the very generality of that language from Rule 702A reflects that this court should defer to the district court. This court has said it will not overturn the decision on that question unless, quote, no unreasonable person could agree with the district court's decision. And there are many reasons, and unfortunately, on the question of pedophilic disorder or pedophilic tendencies, unfortunately, because of the waiver, we have to talk about what the district court could have reasonably decided, could have decided within the applicable standards since the defense's position deprived the court of an opportunity to actually rule on that subject. Primarily, I think we need to look at Rule 702A. As I said already, the elements of attempted sex trafficking do not involve proof as to whether the defendant has pedophilic tendencies, as the panel has already observed, seems to be irrelevant. And as, of course, part of the reason why it's irrelevant, as the defense itself, I think, acknowledged below, someone without those tendencies could commit the offense and vice versa. And then Rule 403, which is also important here in relation to expert testimony, the risk of distracting or misleading the jury would have been especially great in this case in light of, to paraphrase something this court has said, in light of the aura of special reliability that often surrounds expert testimony. And then on the concept that sexual interest in adults does not indicate a sexual interest in children, the court did rule, the district court did rule on that one, and the court was obviously correct in observing that's a common sense thing for all of us. No expert testimony was needed for that common sense proposition. In its briefing, the defense asserts, and I believe defense counsel alluded to that to this argument this morning, the defense argues that the government opened the door to that kind of testimony, testimony on that subject, from an expert for the defense because of the government's own evidence about Mr. Curtin's sexual activities involving adults. But factual evidence, factual evidence, which is what the government presented on that subject, factual evidence about Mr. Curtin's conduct is very different from expert opinion testimony, both in its basis and in its potential impact on the jury. The defense could argue, and in fact I believe below, the defense did argue at trial that Mr. Curtin's sexual interest in adults did not suggest a sexual interest in children. In fact, the defense put on testimony to that effect that from his wife, I believe, also from, I think it was a school teacher, that they had never seen Mr. Curtin act inappropriately around children. And finally on harmless error, aside from all of this, even if the district court did make any error, we submit that it was harmless. Evidentiary errors warrant reversal only if there is a quote-unquote significant chance that they affect the outcome. Now granted, granted in this case there wasn't quite as much evidence as there are in other cases to support the jury's guilty verdict, but still the evidence was pretty overwhelming. Among other things, Mr. Curtin continued this conversation with the father for 10 weeks. He repeatedly reached out to resume it. He complained about being ignored when there was a lull in the conversation when the agent delayed in responding to him. He said he would love to get together. He said he had forgotten the girls' looks at one point, and he came to the meeting with the agreed amount of currency to pay for the encounter in a separate part of his wallet. So Your Honor, it's for all these reasons, and there are many different bases on which the court could affirm. Whatever basis the court believes is most appropriate, we urge the court to affirm. Thank you. Thank you, Mr. Simpson. Could I ask? Oh, yeah, sure. Mr. Simpson, to me what makes this a closer call than it should be is that the government, it seems to me, did not just say, oh, well, you know, he likes to have sex with adults, so he must like to have sex with children. I think the government's focus was on what it would characterize as abnormal or atypically voracious appetite for adult sex, like prostitutes, et cetera, et cetera. I think one of their briefs says excessive. Right, right. That makes this, to me at least, that makes this a closer call because by relying on that, a jury might more readily transfer that because it's excessive and, quote-unquote, atypical or abnormal to liking sex with children because that, too, is kind of atypical and abnormal. And so it seems to me closer to the line than if the government were just saying, well, because he likes to have sex with adults, he likes to have sex with children. I wondered if you have a response to that. Your Honor, like I said, the defense pushed back on that, on the government's evidence along those lines, in two different ways. The argument, they argued as they could that the sexual interest in adults didn't necessarily suggest a sexual interest in children. And they did, as they could have, they did present evidence, quite a bit of evidence, in an effort to show that Mr. Curtin did not have a sexual interest in children. All of this is factual evidence. The government brought in Mr. Curtin's own activities and the defense brought in other evidence as to his activities or lack thereof. Here we're talking about factual evidence, whereas when we're talking about expert testimony, we're getting, we think, into a whole other area, partly because of that aura of special reliability. So I think we need to be especially vigilant in relation to, or especially deferential to the district court judge in relation to expert testimony for that reason. All right. Thank you. Thank you. Thank you. Mr. Wright, we'll give you one minute. I do want to pick up off the thread that you all just ended on, sort of with the common sense argument and whether it was necessary to have expert rebuttal. I would point to the government's citation to Davenport, which is an unpublished case, but it describes the basis for why this court previously allowed sort of expert testimony about pedophilic habits and sort of habit testimony. And it explains that what jurors know or think they know about criminal conduct, it's right, is an important question on which social science can be illuminating. Disabusing jurors of mistaken common knowledge and helping them sit facts and suppositions are important functions of experts. That was directly talking about sort of pedophilic tendencies. And I think the short answer is that human sexuality is complicated. We don't know if there could have been a juror who visited the same brothels as Mr. Curtin and thought this was all normal behavior. There could have been a juror who thought that anyone who looks at any pornography is one step away from sexual assault. We don't know what the jurors' assumptions were coming in. And with the evidence that he already was outside the general population, rebuttal both on what the shape is of his deviant traits and also why those deviant traits don't carry over to other deviant traits, I think was important. Unless this court has any other further questions. Thank you very much. Thank you. Thanks to both counsel. The court will take the case under advisement. And that concludes our oral arguments for today.